

# PohlmanUSA®

## Court Reporting and Litigation Services

---

Patrick A. Fogerty

July 15, 2021

---

Patrick A. Fogerty

vs.

Quiktrip Corporation

**Exhibit 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PATRICK A. FOGERTY,            )
                              )
        Plaintiff ,            )
                              )
                              ) Cause No. 4:21-CV-00060-HEA
vs.                           )
                              )
                              )
QUIKTRIP CORPORATION,         )
                              )
        Defendant.            )

DEPOSITION OF PATRICK A. FOGERTY

Taken on behalf of the Defendant
July 15, 2021

Christopher C. Wiegers, CCR-MO, CSR-IL

PohlmanUSA Court Reporting

877-421-0099

**Exhibit 1**

INDEX OF EXAMINATION

                                                              PAGE

EXAMINATION BY MS. RICKS                                        4




                        INDEX OF EXHIBITS


EXHIBIT A - Video Still Picture                                56

EXHIBIT B - Video Still Picture                                59

EXHIBIT C - Video Still Picture                                63

**Exhibit 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


PATRICK A. FOGERTY,            )
                              )
        Plaintiff ,            )
                              )
                              ) Cause No. 4:21-CV-00060-HEA
vs.                           )
                              )
                              )
QUIKTRIP CORPORATION,          )
                              )
        Defendant.            )


            DEPOSITION OF PATRICK A. FOGERTY, produced, sworn, and examined on behalf of the Defendant on July 15, 2021, between the hours of ten o'clock in the forenoon and three thirty in the afternoon of that day, at Horice, Radice & Associates, LLC, 2123 Marconi Avenue, St. Louis, Missouri, 63110, before Christopher C. Wiegers, Certified Court Reporter for the State of Missouri.



            * * * * * * * * *


    Defendant represented by Ms. Katherine Ricks of the law offices of Armstrong Teasdale LLP, 7700 Forsyth Blvd., Suite 1800, St. Louis, MO 63105.


    Plaintiff represented by Mr. Robert Radice of the law offices of Horas Radice & Associates, LLC, 2123 Marconi Ave., St. Louis, MO 63110.


                PohlmanUSA Court Reporting
                    877-421-0099

3

**Exhibit 1**

EXAMINATION BY MS. RICKS

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiffs and Counsel for the Defendants, that this deposition may be taken by shorthand by Christopher C. Wiegers, a Certified Court Reporter, and afterwards transcribed into typewriting.

0-0-0

\* \* \* \* \* \* \* \* \*

PATRICK A. FOGERTY,

Of lawful age, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, deposes and says in reply to oral interrogatories propounded as follows:

EXAMINATION

BY MS. RICKS:

Q.   Mr. Fogerty, we already introduced ourselves, but I'm Katie Ricks, and I represent QuikTrip Corporation.

We're here today because you filed a lawsuit. You're seeking damages arising from a slip and fall at QuikTrip Number 629 at 4450 Meramec Bottom Road in St. Louis, Missouri 63129 that occurred on September 2, 2020.

**Exhibit 1**

EXAMINATION BY MS. RICKS

way.

Q.   Me too.  I'm on there, but I would say I probably haven't posted in years.

A.   All the kids are -- or my girls.  But I don't really mess with that.

Q.   Have you removed anything from your Facebook account since September 2, 2020?

A.   No.

Q.   So when we began I stated that you made a claim about a slip and fall at QuikTrip store number 629 on Meramec Bottom Road.

A.   Yes, ma'am.

Q.   So when I refer to the QuikTrip store, can we agree that's what I'm talking about if I say QT, QuikTrip, the store?

A.   Yes, ma'am.  Sure.

Q.   I'm talking about that location.  Okay?

A.   Sure.

Q.   How many times have you visited that particular QuikTrip location?

A.   Like a million probably.  A lot.

Q.   Is it close to your house?

A.   Yes, ma'am.

Q.   So is that kind of your QuikTrip?

A.   Yes.

**Exhibit 1**

around.  Let's say ice versus just water or something.  You know, with ice I would -- I don't know.  I just proceed with caution.  That's what I do.  Usually everything works out for the best, you know.

Q.    Would you agree that even a clean and dry floor can be slippery if your feet are wet?

A.    I think I'm speculating like that.  You know, I'm speculating with that.  I don't know with that.  I know like the day when I fell -- when I got out of the car I saw water there.  And when I went to the door I was extremely slow.  When I opened the door and went in, the woman to my left yelled hey, would you put your mask on, and I was like sure.  I was more in tune with what's going on with the floor here.  And the manager I think was a male.  He was kind of to my right in front of me.  He said the same thing.  He said hey, could you put your mask on, and I was like sure.

And then as I was trying to move -- that cash register wrap is like here where she was at.  I was trying -- and that rug is here.  I was trying to move over against that.  And when I got kind of against it and when I started moving forward and I stepped on that tile floor, that's when I flipped back on my elbow.  And I can remember -- and when I got dumped like that, I remember getting on my knees and I was trying to figure out what happened here with this.  I remember the manager -- he did

**Exhibit 1**

EXAMINATION BY MS. RICKS

off of that and stepped on the tile -- as soon as I stepped on that, you know, it flipped me backwards on my right elbow.  When I was falling I was trying to like control a little bit how I landed, like playing football or whatever. I was trying to like pull my head forward a little bit or whatever.  But then I struck this elbow first.

Q.    Do you remember that there was an entry mat at the store on September 2nd?

A.    Yes.

Q.    So you stated that you did notice that and walked over it?

A.    Yeah.

Q.    And would you agree that you did have an opportunity to wipe off your feet on that mat?

A.    You know, to be honest with you, I probably did wipe it just to be cautious going in there.  I think I probably did for sure, yes.  Because I was obeying their kind of rules there.  You know what I'm saying?  But like when I did fall, like I said, it just rang in my ear because the manager said -- I think it's the manager.  He said I thought that if I had that rug there and whatever things he did -- he said I thought that that would be okay, but I guess next time I'll have to do something different.  I was like I guess so.  I mean, I fell here.  I think you may have to for sure.  You don't want somebody else to fall.  But

PohlmanUSA Court Reporting
877-421-0099

46

**Exhibit 1**

EXAMINATION BY MS. RICKS

that just rang in my ear when he kind of said that.

Q.    Okay.  Do you remember what time of day this incident happened?

A.    It was between like noon and maybe 1:30 or 2:00.

Q.    Would 12:51 sound correct?

A.    Yes, ma'am.

Q.    And before you went to QT on September 2nd, what did you do that day?

A.    I probably took a shower before we left the house. That was our -- we go there all the time and use the ATM or grab milk or a little pizza or something.  I mean, we go there all the time.  That was just our time frame being there.  But, like I said, you know, I got dumped like that. And then he was saying I thought that if I put that rug down -- or maybe next time I'll do this or whatever.  And I was still trying to like rationalize what exactly happened so I didn't repeat this again.

Q.    So you would -- it was just sort of a normal morning and you --

A.    Yes.

Q.    -- had just showered and --

A.    Sure.  Yeah.  Go get gas and, you know, hit the ATM or something.  Like I said, I always grabbed milk and stuff. Everything there food-wise is great, too.

Q.    And had you taken any medications that day?

EXAMINATION BY MS. RICKS

A.     No, ma'am.

Q.     So you came from home and went straight to QT?

A.     Yes.

Q.     And you mentioned that you did see water on the sidewalk?

A.     Yes.

Q.     Generally speaking, you know that kind of wet surfaces -- you mentioned you like to be -- you were using extra caution because you noticed it was wet?

A.     Yes.

Q.     Is that because you know that wet surfaces can cause you to lose your balance?

A.     Sure.  I mean, let's say -- like when I worked at McGrath we had classes and different things on safety.  They were a company that's really big on that.  You know, I was kind of with our little group there, but I -- you know, I would tell them like make sure your cords and stuff and everything was taped where somebody won't trip.  I'm always aware for sure.

Q.     Did you ever do any of your OSHA 10 or 30 training when you were a carpenter?

A.     I don't -- I don't think I did those.  We just did whatever McGrath had there with the foremen.  Like maybe on a Friday we'd run over some things and that, but --

Q.     Did you guys call those toolbox talks or safety

**Exhibit 1**

glasses, and you're wearing glasses today; right?

A.   Yes.

Q.   Are the glasses you were wearing at the time of this incident -- are those the same glasses you're wearing now?

A.   Yes, ma'am.

Q.   So is that prescription still good and current?

A.   Yes, ma'am.

Q.   Okay.  And when you guys arrived at QT -- when you -- by you guys I mean you and Joyce.

A.   Yes.

Q.   When you and Joyce arrived at QT that day, do you remember where you parked?

A.   Right in front at the handicap parking.  She has one of those handicap stickers and she used that.  That's hers, that handicap.

(Defendant's Exhibit B marked for identification.)

Q.   (By Ms. Ricks)  Okay.  Mr. Fogerty, I've handed you another photograph, which we've marked as exhibit B.  Again, we see the time stamp up in the upper left corner.

Am I correct that it says September 2, 2020?

A.   Yes.

Q.   And the time stamp is 12:51 p.m.?

A.   Yes.

Q.   Is that your vehicle sort of in the center of the

EXAMINATION BY MS. RICKS

photograph there, the gray SUV?

A. Yes, ma'am.

Q. And you mentioned that Joyce had parked in the accessible parking spot?

A. Yes.

Q. And earlier you stated that you noticed there was water on the ground when you walked in?

A. Yes.

Q. Can you see that in this photograph?

A. Yes.

Q. Do you recognize this angle from the security video footage that you said you reviewed beforehand?

A. Yes.

Q. So would you say this is a fair and accurate representation of what the outside of the store looked like when you walked in?

A. Yes, ma'am.

Q. Okay. So is that you in the photograph nearing the door to the QuikTrip?

A. Yes, ma'am.

Q. You have on the red hat?

A. Yes, ma'am.

Q. And you're wearing kind of a greenish gray shirt?

A. Yes, ma'am.

Q. Okay. And, again, if you want to refer back to

**Exhibit 1**

this photograph, that's fine.

A.   Sure.

Q.   You just let me know.

A.   Yes, ma'am.

Q.   Okay.  We were just looking at the photograph of where you all had parked the car in the accessible spot.

You stated that you did notice that there was some water on the ground outside as you walked in?

A.   Yes, ma'am.

Q.   So as you walked in, did you look down at the ground as you were walking?

A.   Oh yeah.

Q.   I think earlier you stated that you had noticed it was wet, so you were being extra cautious?

A.   Sure.  Yes.

Q.   So you were looking down?

A.   Yes, ma'am.

Q.   Nothing was obstructing your view?

A.   No, ma'am.

Q.   And then as you're going in the door, do you remember kind of turning around to talk to Joyce at all as you were walking in?

A.   No, ma'am.

Q.   Okay.  Would you have any reason to dispute the security video footage if it showed you doing that?

EXAMINATION BY MS. RICKS

A.    No.  I mean -- well, hang on just a second.  I think I did.  I think I did after the fall.  I remember I think I looked back maybe.  I might have motioned for her to come at that point maybe, yeah.

Q.    And that's fine.  I know I'm asking you very detailed questions.  So if there's something that you just go gosh, I don't remember, that's okay, Mr. Fogerty.  You can tell me that.

A.    Yes, ma'am.

Q.    Can you describe where you walked as you entered the store?

A.    Well, I opened the door, like I said, and I saw the carpet on the floor there was wet.  And, like I said, the woman yelled to put my mask on.  You know, I kind of looked at her and I said sure.  And then as I was going to kind of move forward, the manager -- I think the male was standing there and he said hey, could you put your mask on, and I was like sure.  And then, you know, like I said, I was trying to move myself over to that counter to get up against that.  And then when I stepped off of that rug on that floor is when I slipped and fell straight back on my elbow.

Q.    Okay.  And I'm handing you again that Exhibit A that shows kind of right as you're walking in the store.

A.    Yes, ma'am.

Q.    And to the best of --

PohlmanUSA Court Reporting
877-421-0099

62

**Exhibit 1**

EXAMINATION BY MS. RICKS

MR. RADICE:  Exhibit B?

MS. RICKS:  That's the outside one.  The parking lot one is Exhibit B, and then inside of the store is A.

MR. RADICE:  Oh I thought you said walking in the store.  This is after he fell; right?  Maybe I misheard what you said.

MS. RICKS:  Yeah.  Sorry.

A.  Like you're saying after I fell -- yeah, I think I probably turned for her -- kind of motioned for her to come in for a moment.

MR. RADICE:  Sorry.

MS. RICKS:  That's okay, Bob.

Q.  (By Ms. Ricks)  You've got Exhibit A that the court reporter has marked in front of you.  If you wouldn't mind -- I'll hand you a pen.  Would you circle on the photograph about where you recall slipping?

A.  Well, like I said, as soon as I kind of stepped off -- it was with my right foot.  It was right here.

Q.  So you've circled just past that floor mat?

A.  Right.

Q.  Okay.

(Defendant's Exhibit C marked for identification.)

Q.  (By Ms. Ricks)  I've just handed you another photograph, which is a screen grab from that security video that you say you viewed.  This is the same angle as Exhibit

PohlmanUSA Court Reporting
877-421-0099

63

**Exhibit 1**

EXAMINATION BY MS. RICKS

A that we were just looking at.

A.    Yes, ma'am.

Q.    This is just before you fell.  So if you look at the time stamp, this one says 12:51:53 on September 2, 2020, whereas Exhibit A says 12:52:29.

A.    Okay.

Q.    So is this a fair accurate -- exhibit C that I just handed you, is this a fair and accurate portrayal of how the store looked right as you walked in just before you fell?

A.    I think so.

Q.    So, again, would you agree there is a floor mat that you are walking in across?

A.    Right.

Q.    And do you see a wet floor sign in this photograph?

A.    There's a sign.  I don't really know for sure what's written on that, though.  I mean, caution is there, but I couldn't tell you what's written on it.

Q.    So you see a yellow kind of triangular sign on the floor?

A.    Right.  It might say wet floor.  I'm not for sure because I'm not there, but -- yeah, I mean, that --

Q.    And even if you don't know what the writing says on the sign, do you generally understand that when you see caution signs of this type, whether they're yellow or orange, that it generally means there might be a wet floor

PohlmanUSA Court Reporting
877-421-0099

64

**Exhibit 1**

EXAMINATION BY MS. RICKS

or some sort of hazard on the floor?

A.    Yes, ma'am.

Q.    So even if you can't recall or can't tell from this grainy security video screen shot exactly what it says, you know what it generally means?

A.    Sure.

Q.    And what do you take that to mean when you see a warning sign of this kind?

A.    To, you know, look around the area and see, you know, exactly what's kind of around you, like 360 degrees, you know.

Q.    Okay.  And, again, we're in agreement that this still shot is from just before you fell --

A.    Yes, ma'am.

Q.    -- as you're walking into the store?

A.    Yes, ma'am.

Q.    Is there anything blocking your view of that wet floor sign?

MR. RADICE:  Are you saying in this picture?

MS. RICKS:  Exhibit C, Bob.

MR. RADICE:  Exhibit C.  Okay.  I'm just a little confused.  Are you asking him if there was anything distracting him from seeing it that day?  Or now, looking at the exhibit, is there anything blocking his view?  That's what I'm confused about.

PohlmanUSA Court Reporting
877-421-0099

65

**Exhibit 1**

EXAMINATION BY MS. RICKS

Q.    (By Ms. Ricks)  Mr. Fogerty, did you understand my question when I'm asking about if there was anything blocking your view of the wet floor sign?

A.    When I was walking in like that?

Q.    Right.

A.    No.  It was sitting there.  I mean, I can't tell because I'm not in that space.  But, I mean, yeah, if it was there and I'm coming in and I see it there, I know to look around, you know, for sure.

Q.    And you had mentioned that you were being extra cautious because you had walked through that water on your way in?

A.    Yes.

Q.    And you were making sure to look in front of you carefully where you were walking?

A.    Yes, ma'am.

Q.    And you've also stated that you do see that there's a warning sign kind of directly in the path where you were walking into the store?

A.    Yes, ma'am.

Q.    Do you recall seeing any other wet floor signs other than the one that this is visible here in Exhibit C?

MR. RADICE:  And I'm going to object because -- and I'm not trying to be tricky here, but I don't think you've directly asked him if he saw it or noticed it that day.

PohlmanUSA Court Reporting
877-421-0099

66

**Exhibit 1**

EXAMINATION BY MS. RICKS

Because we're looking -- you're talking about the fall at one point and you're looking at the photograph at another point.  So you might want to ask him that directly.

Q.     (By Ms. Ricks)  Mr. Fogerty, I've asked you was there anything obstructing your view of the wet floor sign that day on September 2nd?

A.     No, ma'am.

Q.     Do you recall seeing the wet floor sign on September 2nd?

A.     I probably do.

Q.     Okay.  Do you recall seeing any other wet floor signs in the store that day?

A.     Not that I recall.  Like I said, when I stepped off of there and slipped and fell back, that's when, you know, immediately he came over, the manager.  I just remember him saying, you know, I thought that if I did -- you know, had this rug here and the other things he was throwing out that everything would be cool, but he goes next time I guess I'll have to do X, Y, Z.  And I was like sure.

Q.     And either before you fell -- and I know this all happened very quickly.

To the best of your memory -- you don't need to hold that anymore if you don't want to.  We can set it down.

A.     Sure.

Q.     To the best of your memory, before you fell, did

PohlmanUSA Court Reporting
877-421-0099

**Exhibit 1**

EXAMINATION BY MS. RICKS

you notice any liquid or other substance on the floor?

A.    Just -- you know, just what was on that carpet and on the tile floor itself.  I mean, I couldn't make out water or chemicals or whatever, but I just was -- you know, I knew I was just going to proceed with caution getting off the carpet over to the ATM.  And then when I stepped with my right foot, that's when it just dumped me.

Q.    I understand.  And we'll get to the more mechanics of how you fell.  We've already talked about what the manager said.  So in the interest of just kind of keeping things moving, just kind of listen to the question I'm asking and only answer that.  I'm not trying to be critical. I know that that's what you're really focused on is actually when you fell because that's the thing that's impacting you. But I want to try to get some other information, too, and get some clear answers to those questions.  Is that fair?

A.    Yes, ma'am.

Q.    So on Exhibit A you had circled about where you had fallen.  So before you fell --

A.    I would say kind of where I stepped off on the floor.  Like that would be kind of, you know, your foot kind of in that area going forward.

Q.    Right.  So in that area approximately where you've circled the photograph, do you recall seeing, before you fell, any liquid or substance on that floor?

PohlmanUSA Court Reporting
877-421-0099

68

**Exhibit 1**

EXAMINATION BY MS. RICKS

A.    I don't think so.

Q.    Okay.  So you don't recall --

A.    I mean, I noticed that the water was like I on that carpeting.  Like I said, I don't know what was on the tile.  Like I said, I was just moving -- you know, he was saying, you know, be careful or whatever, and I was like sure.  I was just kind of like trying to make my way off of that carpet over to the ATM machine there.

Q.    That's okay.  I'm just asking some questions to understand kind of what you remember about the incident.  So, again, we'll kind of talk more about your interaction with the manager and what you remember about actually falling in a little bit here.

A.    Okay.

Q.    So you don't recall -- you stated that you don't recall seeing any liquid or substance on the floor in that area where you've circled on Exhibit A before you fell?

A.    Well, I think -- you know, like I'm saying, the water was -- I don't know that the water liquid -- I mean, it was wet.  All I know is I saw that on the carpeting and the floor.  And that's -- I was just moving slowly.

Q.    So you've said a couple different things, and I just want to make sure I clearly understand.  We're talking about before you fell.

A.    Yes, ma'am.

Q.    I know this all happened quickly.  So the period of time we're talking about before your fall, during and after your fall, is all a matter of 30 seconds maybe.

A.    Sure.

Q.    So before you fell, do you remember seeing any liquid on the floor where you've circled it on Exhibit A?

A.    Well, I think, yes.  I mean --

Q.    Not on the carpet.  On the tile.

A.    It was kind of -- yeah, it was wet.  I mean, you can see on the photo it's kind of wet.

MR. RADICE:  All she wants to do is know what you remember seeing that day.  If you don't remember something, you don't.  If you do, you do.

Q.    (By Ms. Ricks)  And, Mr. Fogerty --

A.    Like I'm saying -- you know, I was -- like what was on the carpeting is what I was paying attention to until I got to the next spot.  And, you know, I don't know for sure if it was water.  That's your deal there.  And, like I said, as soon as I stepped off I was just dumped right there.

Q.    That's fair.  And I'm trying understand before you stepped off the rug, before you fell, to the best of your memory, do you remember seeing any liquid on the floor there, on the tile portion of the floor?

MR. RADICE:  It's whatever you remember.  If you don't remember something, you don't remember.

**Exhibit 1**

EXAMINATION BY MS. RICKS

A.    I mean, there was liquid kind of everywhere.  You know, I was just trying to navigate through that.

Q.    (By Ms. Ricks)  You just said there was liquid kind of everywhere.  What do you mean by that?

A.    Well, it was on the floor there.  You know, it's all over this carpet.  You can see it's wet there, how it looks.

Q.    Mr. Fogerty, you're looking at Exhibit A, which is after you fell.

A.    Sure.

Q.    And we've already discussed your shoes were wet.

A.    Sure.

Q.    So before you fell -- perhaps you should be looking at Exhibit C if you need something to refresh your recollection.  I would rather you just answer from the best of your memory.

A.    Okay.

Q.    Do you recall seeing any liquid on the tile floor just past the mat in the location where you indicated that you slipped before you fell?  And if you do not remember seeing it, that's perfectly okay.

A.    I don't really remember totally exactly that.

Q.    Okay.

A.    And it was -- I don't remember exactly.

Q.    Okay.  It would make sense to me that you wouldn't

**Exhibit 1**

EXAMINATION BY MS. RICKS

mechanics of how you fell. You stated that you were walking in and someone asked you to put on a mask.

A.    Yes, ma'am.

Q.    And I'm rehashing since we've talked about it a little bit. So stop me if you want to correct anything.

A.    Okay.

Q.    You stated that you walked across the mat, and just as you're stepping off onto the tile your feet slipped; is that right?

A.    Yes, ma'am. And as I was falling -- you know, like playing football or -- I was trying to like -- I knew I was falling. I was trying to like, say, protect my head or whatever like that and I, you know, crashed on this right elbow first. That's just kind of how it went down there.

Q.    So do you remember which foot you put down first?

A.    I would think -- I want to say the right foot, but I don't -- I am right-handed. I don't know about that. I would say the right one probably.

Q.    That's okay. If you don't remember, you can just say I don't remember.

A.    Okay.

Q.    So when you put your foot down -- to the best of your memory, that first step that you took your foot slid?

A.    Yes.

Q.    Okay.

**Exhibit 1**